# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

No. 99-30294
Summary Calendar

---

VAULTING AND CASH SERVICES, INC.,

Plaintiff-Appellant,

VERSUS

DIEBOLD, INC.,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
(97-CV-3686-N)

---

October 22, 1999

Before SMITH, BARKSDALE, and
STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Vaulting & Cash Services, Inc. ("V&C"), appeals a summary judgment in favor of Diebold, Inc. ("Diebold"), in V&C's suit against Diebold for breach of contract. V&C contends that the district court erred in holding that the contract barred V&C from recovering lost profits on showing breach of contract. Finding no error, we affirm.

## I.

The suit arose from the termination of the ATM Transit and Service Agreement (the "Agreement") between V&C and Diebold.

Diebold is a major manufacturer of automated teller machines (ATM's); V&C is an armored car company that provides cash-handling and first-line services for ATM owners.[1] In August 1995, Diebold signed a contract with First National Bank of Commerce to provide all-inclusive servicing of its ATM's. The contract required Diebold to provide the cash-handling as well as first- and second-line services on the bank's ATM's. Because Diebold lacked the capability to provide cash-handling services, it subcontracted them to V&C.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] There are three types of services performed on ATM's: cash-handling services; first-line services; and second-line services. Cash-handling services consist of picking up deposits and replenishing the cash supply at the ATM's. First-line servicing deals with paper shortages, paper jams, currency jams, ribbon shortages, and the like. Second-line servicing is generally provided by the manufacturer and consists of providing technical assistance and performing repairs that are beyond the capabilities of the cash handlers or first-line servicers.

The Agreement specified a term of three years but provided that either party might terminate the contract for non-performance after thirty days' notice. The Agreement contained a "rider," clause three of which ("Clause Three") stated:

> Notwithstanding anything to the contrary, in no event shall Diebold be liable to Subcontractor for indirect, incidental, consequential or similar damages, lost profits, [sic] lost business opportunities, whether arising under contract, tort, strict liability or other form of action, even if Diebold has been apprized of the possibility of such damages.

Diebold alleged that, from the beginning of the Agreement, V&C had failed to perform satisfactorily, and it claimed further that, from the first year of the Agreement, it had informed V&C of its displeasure with V&C's quality of service without V&C's acting to remedy the situation. Finally, in October 1997, Diebold gave notice to V&C of its intent to terminate the Agreement for non-performance. V&C responded by suing for breach of contract, "bad-faith breach," and for violations of the Louisiana Unfair Trade Practices Act ("LUTPA").

Diebold moved for summary judgment on all claims, or in the alternative on V&C's claims for lost profits and attorneys' fees and its claims under LUTPA. The court granted this motion in part, ruling that Clause Three unambiguously denied V&C the opportunity to recover lost profits for breach of contract.[2] The court clarified that the denial of a lost-profits measure of recovery applied to all lost profits, whether "direct" or "indirect."

_____

[2] The court denied summary judgment on the LUTPA claim and on V&C's "bad-faith breach" claim. By the terms of a partial settlement, however, V&C agreed to dismiss these claims with prejudice, and Diebold agreed similarly to dismiss its counterclaims. Thus, we consider only the breach of contract claim.

## II.

V&C claims the court erred in holding (1) that Clause Three unambiguously denied any form of lost-profits measure of remedy; (2) that the Agreement remained an enforceable contract, given the decision that Clause Three unambiguously denied a lost-profits measure of remedy; and (3) that the unambiguous Clause Three should be honored without regard to parol evidence of the conditions surrounding its adoption. We consider each contention in turn.

## A.

V&C argues that Clause Three does not unambiguously deny all lost-profit measures of remedy for breach of contract, and thus that parol evidence should be admitted to determine the clause's meaning. We agree with the district court that this clause is not ambiguous.

The contract is not artfully drafted. Nonetheless, the words "in no event shall Diebold be liable to Subcontractor for . . . lost profits" establish that at least *some form* of lost profits are denied in a suit on contract. The only ambiguity that could possibly remain is whether the words "indirect, incidental, consequential or similar" modify only "damages," or also "damages, lost profits, [or] lost business opportunities."

Mere complexity of construction does not justify a finding of ambiguity. *See Ellsworth v. West*, 668 So. 2d 402 (La. App. 4th Cir), *writ denied*, 669 So. 2d 1212 (La. 1996). Neither is a contractual provision ambiguous when two interpretations are technically possible, but only one is reasonable. *See Texas E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737 (5th Cir. 1998). Rather, a provision is considered ambiguous if susceptible to more than one reasonable meaning under the circumstance after application of established rules of construction. *See id.; see also Lloyds of London v. Transcontinental Gas Pipe Line Corp.*, 101 F.3d 425 (5th Cir. 1996). These established rules of construction include the "ordinary meaning of words" and of the English language. *See Slocum-Stevens Ins. Agency,*

*Inc. v. International Risk Consultants, Inc.*, 666 So. 2d 352 (La. App. 2d Cir. 1995), *writ denied*, 669 So. 2d 399 (La. 1996).

The common usages of the English language render Clause Three susceptible to one primary interpretation. As a rule, a nominative adjective modifies the noun that most closely follows it; the lack of a comma between the final adjective of a series and the noun following that series indicates that the series modifies the noun immediately following.[3] When a writer intends an adjectiveSSand especially an adjectival seriesSSto modify a series of nouns following the adjective(s), he so signals by insertion of a colon or other separator between the adjectival and nominative series to indicate the unusual usage.[4] Lacking such a signal, the Third Clause should be subjected to the primary, common-usage reading: that the adjectival series "indirect, incidental, consequential or similar" modifies "damages" merely, and not the entire series of nouns following the adjectives.

Largely because the clause is poorly drafted, however, we do not rest our decision merely on a grammatical parsing.[5] Rather, we look also to the reasonableness of the interpretation advanced by each party. If the reading posited by Diebold and endorsed by the district court is applied, then Clause Three excludes as possible items of recovery for claims on the contract all indirect, incidental, and consequential ("indirect") damages and all lost profits and all damages arising from claims of lost business opportunity. Under this interpretation, each of the phrases in the clause carries independent meaning.

If, on the other hand, V&C's interpretation is followed, then the phrases "lost profits" and "lost business opportunities" become surplusage, because, if modified by "indirect" to mean "indirect lost profits" and "indirect business opportunities," then each is wholly subsumed in the already stated universe of "indirect damages." Moreover, by V&C's own admission, the phrase "indirect lost profits" is doubly meaningless because, as a matter of law, lost profits are always considered *direct* damages in breach-of-contract actions; thus a contract provision forbidding recovery of "indirect lost profits" would forbid recovery of, by legal definition, a null set.[6] Reason thus seconds better grammar, supporting Diebold's and the district court's reading of Clause Three: "[I]ndirect, incidental, consequential or similar" modifies "damages" alone, and thus the Clause denies recovery of all lost profits.

B.
V&C contends, in the alternative to its interpretation of Clause Three, that should the district court's interpretation be adopted, then the Agreement cannot be considered an enforceable contract against Diebold, because it allows V&C no remedy should Diebold breach its obligations. We find no merit in this contention.

As noted above, the district court's interpretation of Clause Three effectively denies V&C recovery of all indirect damages,

---

[3] *See* BRYAN A. GARNER, THE ELEMENTS OF LEGAL STYLE 22 (1991); RUTH PARLE CRAIG & VINCENT F. HOPPER, 1001 PITFALLS IN ENGLISH GRAMMAR 1 (3d ed. 1986); cf. THEODORE M. BERNSTEIN, THE CAREFUL WRITER: A MODERN GUIDE TO ENGLISH USAGE 20 (1965) (stating that "intimate . . . is the relationship of an adjective to the noun it modifies").

[4] EUGENE EHRLICH, THE BANTAM CONCISE HANDBOOK OF ENGLISH 166-67 (1986).

[5] Had the drafters of Clause Three followed the conventions of the English language with exactitude, they not only would have included an "or" after "lost profits" but also would have separated "damages, lost profits, [or] lost business opportunities" with semi-colons rather than commas. *See id.* at 166; BERNSTEIN, *supra* n.3, at 362, 373.

[6] *See Moore v. Boating Indus. Ass'ns,* 754 F.2d 698, 717 (7th Cir. 1985), *vacated on other grounds*, 474 U.S. 895 (holding that "[l]ost profits are considered to be general or direct damages in a breach of contract case").

lost profits, and damages for lost business opportunities. Conceptually, these denials leave, as a remedy, all direct damages that are not characterized as lost-profits damages or lost-business-opportunity damages, e.g., restitutory and recissionary measures of damages. By the language of Clause Three, then, breach-of-contract damages are merely limited, not wholly denied.

V&C nevertheless argues that Louisiana law permits, as breach-of-contract recovery, only the damage remedies that Clause Three eliminates, thereby rendering its retained damage remedies nugatory. V&C contends that LA. CIV. CODE art. 1995 indicates that "the only damage for breach of this contract is lost profits." This, however, represents an unrealistic misreading of a one-sentence code provision that reads in full: "Damages are measured by *the loss sustained by the obligee* and the profit of which he has been deprived." *Id.* (emphasis added). Thus, the code did not deny V&C the restitutory and recissionary remedies permitted by Clause Three and did not leave V&C without remedy.[7]

The Civil Code defines a contract as "an agreement between two or more parties whereby obligations are created, modified, or extinguished," LA. CIV. CODE art. 1906, and an onerous contract (as opposed to a gratuitous one) as one by which "each of the parties obtains an advantage in exchange for his obligation," *id.* art. 1909. The Agreement, then, Clause Three inclusive, does remain a contract. Duties applied to both parties under the Agreement, and remedies for breach of duty remained to each party. If V&C chose to characterize its damages claims in a manner denied by the terms of the contract, or if it had no damages claims other than those it agreed to forego under the terms of the contract, it shall not complain of its error in pleading or of

its miscalculation of contractual risk obligation.

## C.

V&C contends that the summary judgment on the breach-of-contract question is error because a material dispute arises with regard to the parol evidence surrounding the circumstances of the interpretation and adoption of the contract, particularly Clause Three. The parol evidence is inadmissible, however.

Louisiana law bars parol evidence to evaluate contractual intent "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences."[8] LA. CIV. CODE art. 2046. Because, as we have noted, Clause Three is not ambiguous, parol evidence is not admissible to determine intent.[9]

V&C contends, however, that in Louisiana, parol evidence must be considered because, in V&C's words, "[f]or a waiver of recoverable damages to be effective it must be (1) written in clear and unambiguous terms; (2) contained in the contract; and (3) brought to the attention of and explained to the parties against whom it is to be enforced" (citing *Fontenot v. F. Hollier & Sons*, 478 So. 2d 1379, 1386 (La. App. 3d Cir. 1985), *affirmed as amended*, 491 So. 2d 624 (La. 1986); *Gulf*

---

[7] *See, e.g., Southwestern Eng'g Co. v. Cajun Elec. Power Co-op, Inc.*, 915 F.2d 972 (5th Cir. 1990) (allowing recovery of "unabsorbed overhead" by a company following breach of contract by the other contracting party that resulted in the idling of the company's plant).

[8] V&C contends that an "absurd consequence" as per the terms of this article would be reached by a contract in which one party was left by the terms of the contract with no damage remedy in the case of the other party's breach. Because, as we have discussed above, the Agreement does not foreclose all damage measures, we need not address this contention.

[9] V&C correctly notes that Louisiana does allow parol evidence to determine a claim of fraud against a partner in contract. *See* LA. CIV. CODE ANN. art. 1848; *see also Harnischfeger Sale Corp. v. Sternberg Co.*, 154 So. 10 (1934); *Broussard v. Sudrique*, 4 La. 347 (1832). V&C overlooks, however, that it has, by consent, dismissed all its claims against Diebold except the breach-of-contract claim, so it is not availed by this exception to the parol evidence rule.

*Am. Indus. v. Airco Indus. Gases*, 573 So. 2d 481, 573 (La. App. 5th Cir. 1990)). We first note that *Fontenot* deals not with a contractual waiver of remedies, but with a waiver of warranties by a "poorly educated" farmer. *See Fontenot*, 478 So. 2d at 1386. The holding of *Fontenot* was partially adopted by the *Gulf American* court and applied, as modified, to cases of waiver of breach-of-contract remedies, but was *not* adopted and applied as V&C indicates.

The *Gulf American* court held that "[f]or a *waiver* of recoverable damages to be effective . . . it must be 1) written in clear and unambiguous terms; 2) contained in the contract; 3) brought to the attention of the parties against whom it is to be enforced." *Gulf American*, 573 So. 2d at 489 (emphasis added). The immediately preceding sentence, however, explains that when a contract contemplates merely "a *limitation* on recoverable damages, . . . such an agreement must clearly indicate the intentions of the parties." *Id.* (emphasis added). As we have said, Clause Three limits, rather than waives entirely, available damage remedies. Thus, the latter "clarity" standard, not the former "brought to the attention" standard, is relevant to this case.

AFFIRMED.